## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| 1. | **ARIN SANDERS,** ) | |
| | ) | |
| | **Plaintiff,** ) | |
| **v.** | ) | **Case No. CIV-21-563-G** |
| | ) | |
| 1. | **THE CITY OF OKLAHOMA** ) | |
| | **CITY,** ) | |
| 2. | **LAVETA BREATH, in her** ) | |
| | **individual capacity as Workers'** ) | |
| | **Compensation Administrator,** ) | |
| 3. | **NICK KELLY, in his individual** ) | |
| | **capacity as Risk Manager,** ) | |
| 4. | **CARLA CHATMAN, in her** ) | |
| | **individual capacity as Personnel** ) | |
| | **Specialist,** ) | |
| 5. | **ANGELA PAYNE-PARKS, in** ) | |
| | **her individual capacity as** ) | |
| | **Human Resources Specialist,** ) | |
| | **and** ) | |
| 6. | **ANGELA PIERCE, in her** ) | |
| | **individual capacity as** ) | |
| | **Assistant Finance Director,** ) | |
| | ) | **JURY TRIAL DEMANDED** |
| | **Defendants.** ) | **ATTORNEY'S LIEN CLAIMED** |

## COMPLAINT

**COMES NOW** the Plaintiff, Arin Sanders, and for her Complaint against the

Defendants alleges and states as follows:

## PARTIES

1.     Plaintiff, Arin Sanders, is an adult female, residing in Oklahoma County,

Oklahoma.

2.     Defendants are:

a.     The City of Oklahoma City, a governmental entity doing business in and around Oklahoma County, Oklahoma  (hereinafter referred to as "City");

b.     LaVeta Breath, in her individual capacity, who at all relevant times hereto was the Workers' Compensation Administrator for Defendant City;

c.     Nick Kelly, in his individual capacity, who at all relevant times hereto was the Risk Manager for Defendant City;

d.     Carla Chatman, in her individual capacity, who at all relevant times hereto was a Personnel Specialist in the Personnel Department;

e.     Angela Payne-Parks, in her individual capacity, who at all relevant times hereto was a Human Resources Specialist; and

f.     Angela Pierce, in her individual capacity, who at all relevant times hereto was the Assistant Finance Director.

**JURISDICTION AND VENUE**

3.     This cause of action arises out of Plaintiff's former employment with Defendant City and is based on the following claims:  (a) disability discrimination, failure to accommodate, the creation of a disability-based hostile work environment, and retaliation for having engaged in protected opposition to disability discrimination and participating in a complaint process based on disability discrimination in violation of the Americans with Disabilities Act ("ADA") and ADA Amendments Act ("ADAAA") and for having requested accommodations; (b) violations of the Family Medical Leave Act ("FMLA"), including

2

interference with and retaliation for Plaintiff's use and/or attempted use of FMLA qualifying leave; (c) race discrimination, harassment, the creation of a racially hostile work environment, and retaliation in violation of 42 U.S.C. § 1981; (d) race discrimination, harassment, and the creation of a racially hostile work environment in violation of Title VII of the Civil Rights Act of 1964; (e) tortious interference with a contract; (f) tortious interference with a prospective economic advantage; (g) breach of contract; and (h) detrimental reliance.

4.     Jurisdiction over Plaintiff's federal causes of action is vested in this Court under 28 U.S.C. § 1331.  This Court has supplemental jurisdiction over Plaintiff's corresponding state law claims as they arise out of the same core of operative facts as the federal claims and jurisdiction over them is vested in this Court under 28 U.S.C. § 1367(a).

5.     To the extent required, Plaintiff has exhausted her administrative remedies as to the above-listed claims by timely filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on or about September 2, 2020.  Plaintiff subsequently received a right to sue letter from the EEOC dated on or about May 18, 2021. This case is timely filed within ninety (90) days of Plaintiff's receipt of her right to sue letter. Plaintiff also timely submitted a Notice of Governmental Tort Claim on or about September 8, 2020.  Plaintiff's tort claimed was deemed denied on or about December 7, 2020.  And, Plaintiff has timely filed her Complaint within one hundred eighty (180) days from the date said tort claim was deemed denied.

**STATEMENT OF FACTS**

6.      Plaintiff, who is an African-American female, was employed with Defendant City for approximately two (2) years, from on or about November 30, 2018, until on or about June 18, 2020.

7.      She was initially hired as a Records Control Clerk, working in the Development Services Department.  She held this position for about nine (9) months, until on or about July 26, 2019 when she moved into the position of Office Coordinator in the Finance Department/Risk Management Division.

8.      At that time, Plaintiff was being considered for an Office Coordinator role in the Development Services Department and in the Finance Department.  However, Risk Manager Nick Kelly (who is Caucasian) and Workers' Compensation Administrator LaVeta Breath (who is  African-American) told Plaintiff they had future plans to promote her to a Claims Analyst position.  Relying on this, Plaintiff accepted the Office Coordinator position in the Finance Department.

9.      Within a few months, on or about September 20, 2019, Plaintiff became a Claims Assistant (still in the Finance Department).  She held this position for the remainder of her employment, until on or about June 18, 2020.

10.      Throughout her employment, Plaintiff was an outstanding employee.  In addition to earning multiple promotions, she received merit pay increases, as well as emails and a card congratulating her on her strong work performance.

11.      When Plaintiff moved into the Claims Assistant position, the job posting stated

4

the position would be under-filling a Claims Analyst position.  This meant that she would be assisting the Claims Analysts with their duties and receiving training to promote into a Claims Analyst role (which paid about  $13,000-$14,000 more per year than the Claims Assistant position).

12.     Plaintiff was also told by Breath, her immediate supervisor, that once she gained knowledge of concepts sufficient to pass the Worker's Compensation Adjuster License Exam, she would become a Claims Analyst.

13.     In the Fall 2019, Plaintiff passed the Worker's Compensation Adjuster's Exam. More and more job duties were placed on Plaintiff.  And, she was handling medical claims and lost-time-claims for City employees.

14.     Plaintiff had also been told her move to a Claims Analyst position had already been budgeted.

15.     As such, Plaintiff continually inquired about the promotion to Claims Analyst. However, her requests were repeatedly ignored, and the promise was not fulfilled.

16.     In or around February 2020, a training was provided by an attorney from a local law firm.  Plaintiff was again promised by Breath that she would be promoted to a Claims Analyst once she completed such training.  However, Plaintiff completed the training, and again the promise was not fulfilled.

17.     Significantly, around this time, one of Plaintiff's colleagues told her that only a certain number of African-American employees were allowed to be hired into the Department, and the quota of African-American staff in her Department had been exceeded.

Plaintiff understood that this racial quota may be impacting her ability to promote within the Department.

18.     Plaintiff also began to notice that she and other African-American employees in Risk Management were treated less favorably than their non-African-American peers.  For instance, one of Plaintiff's co-workers, Brad Stuart, who is White, frequently pushed work off on Plaintiff and Office Coordinator Tyresha Jefferson, who is African-American.  Stuart also took extended lunch breaks and slept at work.

19.     Plaintiff reported this to Breath.  She also repeatedly complained  (from in or around Fall 2019 to Spring 2020) to Senior Claims Analyst Natalie Hunter and Management Specialist Marcus Johnson, both of whom are African-American and held higher level positions than Plaintiff, that she and Jefferson were being treated less favorably than their White peers.  However, no remedial action was taken to remedy the disparate treatment.

20.     Around the first week of March 2020, Plaintiff again spoke with Breath about the promotion to Claims Analyst.  Breath stated she would meet with Plaintiff to discuss it on March 20, 2020.  However, Plaintiff fell ill and had to leave work early that day, notifying Breath of the same.

21.     Breath said she would reschedule the meeting, but never did.  Plaintiff asked several times about resetting the meeting, but her requests were ignored.

22.     Due to Covid, the plan for the Finance Department was to work remotely from in or around the end of March 2020 until on or about June 15, 2020.

23.     In or around late-March 2020, Breath emailed Plaintiff, accusing her of being

6

unprofessional to a City employee.  However, Plaintiff disputed the allegation.

24.     In or around late-March/early-April 2020, Plaintiff was looking for solutions to the issues with her supervisors and the failure to promote.  Therefore, she contacted Personnel Specialist Carla Chatman (who is African-American) in the City's Human Resources/Labor Relations Department.  Plaintiff informed Chatman of the failure to promote despite promises to do so and the circumstances surrounding the hostile work environment.

25.     Plaintiff requested guidance from Chatman on the untenable circumstances. She explained she was being subjected to a hostile work environment which was causing her extreme stress and anxiety, resulting in *inter alia* loss of sleep and appetite (about which Plaintiff also informed Chatman).

26.     Chatman relayed Plaintiff's complaints to Breath and Kelly, despite the fact that Plaintiff told Chatman that she was concerned she would be retaliated against.

27.     Her concerns of retaliation were realized when, on or about April 7, 2020, Breath berated Plaintiff, causing Plaintiff to have a panic attack.

28.     Plaintiff sought medical treatment from her doctor, who ordered her to take medical leave from on or about April 8, 2020 until April 10, 2020.  Her doctor diagnosed her as having had a panic attack, suffering from anxiety, weight gain, hair loss and Irritable Bowel Syndrome, and prescribed her medication for such conditions.

29.     Plaintiff notified Breath of her need for medical leave and noted the absences as Emergency Sick Leave on her time sheet.  She then sent the time sheets to Breath who

would forward the same to HR.

30.     Plaintiff also suffers from asthma.  And, in or around late-2019/early-2020, Plaintiff began suffering from extreme fatigue, pleurisy, joint pain and other symptoms consistent with Rheumatoid Arthritis or other autoimmune disease.  Plaintiff, who has a family history of autoimmune disease, sought treatment from a Rheumatologist, who advised in or around early-2020 he believed Plaintiff's condition to be autoimmune-related. Plaintiff's Rheumatologist also advised that stressful environments (as Plaintiff's workplace) were not ideal for individuals who suffered from auto-immune disease (like Plaintiff).

31.     Based on her medical conditions, Plaintiff is a qualified individual with a disability, in that, her conditions substantially limit her ability to perform one or more major life activities, including but not limited to, her ability to breathe, sleep, eat, concentrate, think and perform certain physical tasks.  Plaintiff's impairments also impact one or more of her internal bodily processes, including *inter alia* her respiratory, digestive, immune, cognitive and neurological systems.  Plaintiff also has record of such impairments and/or was regarded as having such impairments.  At all relevant times though, she was able to perform the essential functions of her job with or without reasonable accommodations.

32.     The retaliation continued after Plaintiff's return from medical leave when on or about April 14, 2020, Kelly sent an email to Plaintiff saying he was disappointed she had taken the issues to Chatman.

33.     Kelly also made a threatening comment, saying he originally had high hopes for Plaintiff, but that it was now up to her as to whether those hopes would be realized.

34.     Then, on about April 16, 2020, Breath called Plaintiff and again began berating her, claiming she had been unprofessional in her communications with others.

35.     When Plaintiff asked for specifics and guidance on improving, Breath became belligerent, raising her voice and stating she could not explain how Plaintiff needed to respond in every circumstance she may encounter.

36.     Plaintiff was then ostracized in her Department, co-workers were told not to take Plaintiff's phone calls and to document everything concerning Plaintiff in an effort to force Plaintiff out, thereby creating an even more hostile work environment.

37.     In or around April 2020, a discussion took place concerning employees physically returning to the office on a rotational schedule.

38.     Plaintiff asked Breath via email in or around late-March/early-April 2020 if she could continue to work from home due to her medical conditions.

39.     A few days later, Breath stated she would look into the request, but failed to follow up with Plaintiff.

40.     On or about May 13, 2020, Plaintiff applied for and was granted intermittent FMLA due to her medical conditions.  Plaintiff also requested a reasonable accommodation in the form of working from home due to her medical conditions.  Plaintiff made the request to Breath, who said she would discuss the same with Kelly.

41.     Plaintiff presented a doctor's note to Breath, Chatman and HR Representative Auntria Johnson to support her request wherein her doctor explained Plaintiff was high-risk for a negative outcome in relation to Covid due to her underlying health conditions, and

therefore, working from home was advised.

42.     Despite this, Chatman told Plaintiff that Breath and Kelly denied her accommodation request, claiming Plaintiff failed to complete a work accommodation request form.  However, Plaintiff had, in fact, completed such a request and told Chatman this.

43.     Chatman further said Breath told her that Plaintiff could not perform her job from home.  However, Plaintiff had been performing her job remotely for more than one month.

44.     Chatman also said Breath claimed that because Plaintiff had her own office, she would be fine coming into work.  However, such excuse failed to take into account Plaintiff's walk into the office, breaks, going to the bathroom, and other situations where she would be required to be around other individuals.

45.     Around this same time, Plaintiff was told by Assistant Finance Director Angela Pierce, who is Caucasian and knew of Plaintiff's request for medical leave, that there allegedly was not sufficient funds to promote Plaintiff to a Claims Analyst position (despite the fact that Plaintiff's move to the position had already been budgeted).

46.     Plaintiff was off work on FMLA from on or about May 26, 2020 through May 27, 2020.

47.     The next day, on or about May 28, 2020, Plaintiff received two (2) emails from Breath and Kelly.

48.     The first email had an attachment that was a write-up from Breath, accusing Plaintiff of not using her leave properly.  Breath claimed Plaintiff did not give sufficient

notice of requested FMLA leave and exceeded the amount of leave permitted within a given period.

49.     However, Plaintiff had accrued leave time available. And, Plaintiff followed the same leave-practices she always had. She had not been told previously that her leave-practices were an issue. Moreover, to Plaintiff's knowledge, her similarly situated co-workers were not being held to the same standards stated in the write-up.

50.     The second email told Plaintiff to appear in person for a meeting with Breath and Kelly that afternoon (i.e., the afternoon of May 28, 2020). However, Plaintiff had not returned to working on-site at that time.

51.     The culmination of such treatment caused Plaintiff to have a panic attack. She clocked out of work early that day and went on FMLA leave from on or about May 28, 2020 until on or about June 5, 2020.

52.     When she returned to work on or about Friday, June 5, 2020, Plaintiff discovered her schedule had been changed. She had been told she would be working in the office on Mondays and Wednesdays. However, with the change, she was scheduled to be in the office on Mondays, Tuesdays and Fridays.

53.     Because her accommodation request was denied, Plaintiff was (and had previously been) required to use FMLA-qualifying leave and Emergency Sick Leave (which was paid) to cover the two to three days per week she was scheduled to physically be in the office.

54.     As such, Plaintiff was forced to use medical leave Monday, June 8 and

11

Tuesday, June 9, 2020.

55.     Plaintiff worked from home as scheduled on Wednesday, June 10 and Thursday, June 11, 2020 (as part of the Department's rotational schedule).

56.     Concerned about the work environment and her health conditions, on or about Wednesday, June 10, 2020, Plaintiff emailed Finance Director Brent Bryant (her fourth level supervisor who is Caucasian).  She complained to him of the failure to promote as promised, the hostile work environment, and the retaliation she had endured.

57.     On or about Thursday, June 11, 2020, Bryant told Plaintiff that he had looked into her situation, that he was aware of her health conditions, and that he advised her to seek an accommodation of teleworking, if needed (though her request to do so had already been denied).

58.     Bryant also stated Personnel was aware of Plaintiff's concerns of retaliation and would continue looking into the issue.

59.     Later that day, Plaintiff asked Human Resource Specialist Angela Payne-Parks (who is not African-American) if she could be transferred to a different Department due to the hostile work environment to which she was being subjected.

60.     Payne-Parks failed to take any steps to remedy the situation, rather telling Plaintiff to sign the May 28, 2020 write-up.  She claimed it was not technically a write-up, but admitted it would become part of Plaintiff's personnel file.

61.     Plaintiff declined to do so, as the allegations were untrue.

62.     On or about Friday, June 12, 2020, Plaintiff was forced to use medical leave

as that was a day she would have been required to be physically present in the office per the rotational schedule.

63.     On or about Monday, June 15, 2020, Payne-Parks told Plaintiff that she was no longer going to be considered for promotion, nor was she going to be transferred, and her request to telework was denied by Kelly and Breath.  This was so despite Plaintiff having sent Payne-Parks emails and other documents supporting her complaints of a hostile work environment and retaliation.

64.     Plaintiff's Department required all staff to report back to the office on Monday, June 15, 2020.

65.     Due to the failure to accommodate, Plaintiff was again forced to use medical leave June 15, June 16 and June 17.

66.     However, on or about June 18, 2020, based on the failure to accommodate and due to the hostile work environment, Plaintiff was forced out of her employment.

67.     Despite her medical conditions and physicians' recommendations, Plaintiff would have been required to return to working on-site once her paid leave was exhausted (or face not getting paid). And, Plaintiff's physicians repeatedly recommended Plaintiff resign from her employment.

68.     Several months later, on or about November 19, 2020, Plaintiff received a letter from Payne-Parks stating the City's investigation into Plaintiff's complaints found "sufficient evidence to substantiate the allegations that a policy violation occurred."

69.     As a direct and proximate result of Defendants' actions, Plaintiff has suffered

injuries as described hereafter.

## COUNT I:  ADA/ADAAA

For her first cause of action, Plaintiff incorporates all prior allegations and further alleges and states as follows:

70.     This count is asserted against Defendant City.

71.     The matters alleged above constitute disability discrimination, failure to accommodate, harassment, the creation of a disability-based hostile work environment, and retaliation for having requested accommodations and for having engaged in protected opposition to disability discrimination and participating in a complaint process based on disability discrimination in violation of the ADA/ADAAA.

72.     More specifically, Plaintiff was a qualified individual with a disability, in that, she suffers from impairments which substantially limit one or more major life activities, as set forth above.  Plaintiff's disabilities impact one or more of her internal bodily processes, as shown herein.  And, Plaintiff has a record of disability and was regarded as disabled because she had an actual or perceived impairment at relevant times hereto.

73.     Despite her impairments, Plaintiff was able to perform the essential functions of her job with or without reasonable accommodations at all relevant times hereto.

74.     Defendant City denied Plaintiff reasonable accommodations.  And, Plaintiff was constructively discharged from her employment under circumstances giving rise to an inference of discrimination.

75.     Plaintiff is also entitled to relief under the ADA and ADAAA for disability-

based harassment and the creation of a disability-based hostile work environment, as looking at the totality of the circumstances, Plaintiff was subject to harassment which was pervasive or severe enough to alter the terms, conditions or privileges of her employment and the harassment and hostility stemmed from disability-based animus.

76.     The matters alleged above also constitute a violation of 42 U.S.C. §12203(a) for retaliating against Plaintiff for her opposition to Defendant's disability-based employment practices and retaliating against Plaintiff for participating in proceedings concerning disability-based harassment and discrimination.

77.     The matters alleged above also constitute retaliation for having requested reasonable accommodations in violation of the ADA and ADAAA.  Plaintiff is entitled to relief because she is a qualified individual with a disability, as shown herein; she engaged in protected activity by requesting reasonable accommodations; she suffered adverse actions subsequent to the protected activity and a causal link exists between the protected activity and the adverse actions.

78.     As damages, Plaintiff has suffered lost income, past and future, emotional distress and other non-pecuniary losses.

## COUNT II:  FMLA

For her second cause of action, Plaintiff incorporates all prior allegations and further alleges and states as follows:

79.     This count is asserted against all Defendants.

80.     The matters alleged above constitute interference with and retaliation for

15

Plaintiff's use or attempted use of medical leave in violation of the FMLA.

81.     Plaintiff was entitled to medical leave because she worked for Defendant City, a public agency and entity with more than 50 employees within a 75 mile radius of Plaintiff's work site for more than one (1) year and for more than 1,250 hours within the one year prior to her need for leave.

82.     In addition to Defendant City, the individual Defendants are "employers" within the meaning of the FMLA. *See Lindsey v. Brinker Intern. Payroll Co., LP*, 2011 WL 2493047, *4 (W.D. Okla. June 22, 2011) (finding individually-named defendant with power to hire and fire employees and control the conditions of employment was an employer within the meaning of the FMLA).

83.     Defendants interfered with Plaintiff's rights under the FMLA by engaging in acts intended to have a chilling effect on Plaintiff's use of FMLA, including *inter alia* requiring Plaintiff to work in the office despite Plaintiff's doctor recommending she be allowed to work remotely due to her medical conditions (for which Plaintiff took FMLA leave).

84.     Defendants also retaliated against Plaintiff for her use of FMLA by forcing Plaintiff out and constructively discharging her from her employment.

85.     As a direct and proximate result of Defendants' willful conduct, Plaintiff suffered injuries and is entitled to recover all damages or other equitable relief allowed by law, including but not limited to, lost wages, past and future, liquidated damages, based on the willfulness of Defendants' violations of the FMLA, attorney's fees and costs.

## COUNT III:  42 U.S.C. § 1981

For her third cause of action, Plaintiff incorporates all prior allegations and further alleges and states as follows:

86.     This count is asserted against all Defendants.

87.     The matters alleged above constitute violations of 42 U.S.C. § 1981 in the nature of race discrimination, racial harassment, the creation of a racially hostile work environment, and retaliation.

88.     Plaintiff is entitled to relief for race discrimination because Plaintiff is African-American, she was denied a promotion for which she was qualified and non-African-American employees were granted such promotions.

89.     Plaintiff is also entitled to relief for race discrimination because she is African-American, she was qualified for her job, she was constructively discharged from her employment, and her job was not eliminated.

90.     Plaintiff is also entitled to relief for race-based harassment and the creation of a race-based hostile work environment, as looking at the totality of the circumstances, Plaintiff was subject to harassment which was pervasive or severe enough to alter the terms, conditions or privileges of employment, and the harassment was race-based or stemmed from race-based animus.

91.     Plaintiff is further entitled to relief for retaliation because she engaged in protected opposition to race discrimination, she suffered adverse actions subsequent to the protected activity, and a causal link exists between the protected activity and the adverse

actions.

92.     As damages, Plaintiff has suffered lost earnings, past and future, emotional distress and other equitable and compensatory damages allowed by the Civil Rights Act of 1991.

93.     Because the actions of the Defendants were willful, wanton or, at the least, in reckless disregard of Plaintiff's rights, Plaintiff is entitled to punitive damages as provided by the Civil Rights Act of 1991.

### COUNT IV:  Title VII – Race

For her fourth cause of action, Plaintiff incorporates all prior allegations and further alleges and states as follows:

94.     This count is asserted against Defendant City.

95.     The matters alleged above constitute violations of Title VII of the Civil Rights Act in the nature of race discrimination, race-based harassment, and the creation of a race-based hostile work environment.

96.     Plaintiff is entitled to relief for race discrimination because Plaintiff is African-American, she was denied a promotion for which she was qualified and non-African-American employees were granted such promotions.

97.     Plaintiff is also entitled to relief for race discrimination because she is African-American, she was qualified for her job, she was constructively discharged from her employment, and her job was not eliminated.

98.     Plaintiff is also entitled to relief for race-based harassment and the creation of

18

a race-based hostile work environment, as looking at the totality of the circumstances, Plaintiff was subject to harassment which was pervasive or severe enough to alter the terms, conditions or privileges of employment, and the harassment was race-based or stemmed from race-based animus.

99.    As damages, Plaintiff has suffered lost earnings, past and future, emotional distress and other equitable and compensatory damages allowed by the Civil Rights Act of 1991.

## COUNT V: Tortious Interference

For her fifth cause of action, Plaintiff incorporates all prior allegations and further alleges and states as follows:

100.    This count is asserted against the individual Defendants.

101.    The acts described above constitute unlawful tortious interference with a contractual/employment relationship. The individual defendants' actions were malicious and caused actual harm to Plaintiff's employment relationship with Defendant City.   The individual defendants had no justification, excuse or privilege for such interference.

102.    The individual defendants knew or should have known of Plaintiff's employment relationship and expectancy of continued employment with Defendant City.

103.    The individual defendants made the decision to engage in acts resulting in Plaintiff's constructive discharge.  As such, the individual defendants interfered with the employment relationship and expectation of continued employment Plaintiff had with Defendant City.

104.    The actions of the individual defendants were intentional, malicious and wrongful.  The individual defendants were not acting to serve any legitimate or lawful interest of Defendant City, but were pursuing their own motives which included hostility toward Plaintiff due to personal disregard for Plaintiff's state and federal protected rights.

105.    In addition to not being legitimate, the individual defendants' actions were not justified or privileged.

106.    As a result, Plaintiff is entitled to all damages allowed by Oklahoma state law. Moreover, because the actions of the individual defendants were willful, wanton or in reckless disregard of Plaintiff's rights, Plaintiff is entitled to punitive damages.

## COUNT VI: Interference with Prospective Economic Advantage

For her sixth cause of action, Plaintiff incorporates all prior allegations and further alleges and states as follows:

107.    This count is asserted against the individual defendants.

108.    The acts described above constitute unlawful interference with Plaintiff's prospective economic advantage.

109.    Plaintiff had a reasonable expectation for profit in her employment with Defendant City.

110.    The individual defendants had knowledge of this relationship and/or expectancy.

111.    The individual defendants intentionally induced or caused a breach of Plaintiff's expectancy.

112.    Such a breach resulted in damage to Plaintiff.

113.    The individual defendants made the decision to engage in acts resulting in Plaintiff's constructive discharge.  As such, the individual defendants interfered with the employment relationship and expectation of continued employment Plaintiff had with Defendant City.

114.    The actions of the individual defendants were intentional, malicious and wrongful.  And, the individual defendants had no justification, excuse or privilege for their actions.  The individual defendants were not acting to serve any legitimate or lawful interest of Defendant City, but were pursuing their own motives which included hostility toward Plaintiff due to personal disregard for Plaintiff's state and federal protected rights.

115.    Plaintiff suffered damages as a direct result of the actions of the individual defendants.  And, such damages were proximately sustained as a direct result of the complained-of interference.

116.    As a result, Plaintiff is entitled to all damages allowed by Oklahoma state law. Moreover, because the actions of the individual defendants were willful, wanton or in reckless disregard of Plaintiff's rights, Plaintiff is entitled to punitive damages.

### COUNT VII: Breach of Contract

For her seventh cause of action, Plaintiff incorporates all prior allegations and further alleges and states as follows:

117.    This Count is asserted against Defendant City.

118.    The above-described actions constitute a breach of contract.

21

119.    Plaintiff is entitled to relief because Plaintiff and Defendant City formed a contract, under which Defendant City agreed to promote Plaintiff to a Claims Analyst position if Plaintiff completed certain prerequisites; Defendant City breached the contract by failing to promote Plaintiff as promised; and Plaintiff suffered damages as a direct result of the breach.

120.    As damages, Plaintiff is entitled to all relief allowed by state law.

## COUNT VIII:  Detrimental Reliance

For her eighth cause of action, Plaintiff incorporates all prior allegations and further alleges and states as follows:

121.    This Count is asserted against Defendant City.

122.    Defendant City made promises through words, conduct, representations and admissions that Defendant City knew would induce action and forbearance on the part of Plaintiff.

123.    Defendant City promised to promote Plaintiff to a Claims Analyst position upon Plaintiff completing certain prerequisites.  Plaintiff completed the prerequisites, but Defendant failed to promote Plaintiff as promised.

124.    As a result of Plaintiff's detrimental reliance on Defendant's promises, Plaintiff has been damaged.

125.    As damages, Plaintiff is entitled to all relief allowed by state law.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff requests the Court entre judgment in favor of the Plaintiff

and against the Defendants and assess lost wages, including back pay and front pay, actual, compensatory, liquidated and punitive damages together with pre- and post-judgment interests, costs, attorney's fees, all other damages available under federal and Oklahoma state law, and such other relief as this Court may deem equitable and appropriate.

**RESPECTFULLY SUBMITTED THIS 3rd DAY OF JUNE, 2021.**

s/Jana B. Leonard
JANA B. LEONARD, OBA# 17844
LEONARD & ASSOCIATES, P.L.L.C.
8265 S. WALKER
OKLAHOMA CITY, OK 73139
(405) 239-3800     (telephone)
(405) 239-3801     (facsimile)
leonardjb@leonardlaw.net